IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

KEVIN MICHAEL KNOPE,

Plaintiff,

v.

OFFICER KYLE CASASOLA,

Defendant.

OPINION and ORDER

24-cv-778-jdp

---

Plaintiff Kevin Michael Knope, proceeding without counsel, alleges that defendant Officer Kyle Casasola unlawfully seized him based on a complaint received from the mother of his son, Adrianne Dorn. Knope brings a claim for damages under the Fourth Amendment.

Defendant Casasola moves for summary judgment. Dkt. 47. Knope asks for oral argument. Dkt. 65. The undisputed facts, most of which were captured by Casasola's body-worn camera, show that Casasola seized Knope only after his statements and behavior indicated that he could be stalking Dorn. While Knope was seized, Casasola spoke with Dorn to gather facts that provided more support for the belief that Knope was stalking her. I will grant Casasola's motion, deny Knope's motion for oral argument, and close the case.

UNDISPUTED FACTS

The undisputed facts are drawn primarily from the parties' proposed facts and Casasola's body-worn camera video. If a party's proposed fact is unequivocally contradicted by the video evidence, I will accept the facts shown in the video as undisputed. I will also supplement the undisputed facts with state judicial records, of which I may take judicial notice. With that background, the following facts are undisputed.

On September 7, 2024, around 4:00 p.m., Casasola was dispatched to check on a person at a residence in the Village of DeForest, Wisconsin. Dispatch notified Casasola that the caller, Adrianne Dorn, reported that her ex-husband had been pacing outside her residence for approximately 30 minutes, that he had schizoaffective disorder, and that she believed that he was unwell. Dispatch provided the name "Kevin" and described him.

When Casasola arrived, he approached a man walking on the sidewalk across from Dorn's residence who matched her description of the subject, later identified as Knope. Casasola sought to identify whether Knope was Dorn's ex-husband, determine why he was pacing near her residence, and diffuse the situation because Dorn had sought help from the police based his unwanted presence there.

Casasola asked if he could speak with Knope for a second, what was going on, and if he was just walking around the neighborhood. Knope voluntarily answered his questions; Casasola did not tell Knope that he had to stay where he was. *See* Dkt. 61 ¶ 6; Dkt. 49-1, Ex. A at 0:30–0:42.

Casasola asked if Knope lived in the area and he said that he did not. Casasola then asked why Knope was in the area and if his ex-wife or ex-girlfriend lived there. Knope said that the mother of his children lived in the area. Casasola asked Knope why he had come to the area and if he had child custody that day. Dkt. 49-1, Ex. A at 0:56–1:00. Knope was showing signs of agitation and distress, such as lowering and rubbing his forehead and exhaling forcefully. *Id.* at 1:00–26. After a long pause, Knope said that he and Dorn had spent long periods of time without each other. *Id.* at 1:26–30. Casasola tried to confirm if Knope was previously married to Dorn and whether they shared a child. *Id.* at 1:32–44. Knope continued to show signs of agitation and distress, such as exhaling forcefully and raising his head to the

2

sky. *Id.* 1:45–2:08. After another long pause, Knope said that he believed in marriage, not divorce. *Id.* 2:09–14.

Casasola told Knope that he was trying to figure out what was going on because Dorn had called the police and reported that he was pacing outside her residence and did not live there. Knope eventually said that he was there because of his children and that there was an agreement to be with them. *See* Dkt. 61 ¶ 11; Dkt. 49-1, Ex. A at 3:21–53. Casasola asked Knope if he drove to the area and he said that a man had transported him. Dkt. 49-1, Ex. A at 5:43–56.

Casasola also asked Knope if he could remove his hands from his pockets and if he had any weapons on him. *Id.* at 4:29–35. Knope, who is stockily built, responded that he didn't have any weapons on him apart from his own "physical capabilities." *Id.* at 4:36–41.

About 12 minutes into the encounter, a Dane County deputy arrived. Casasola and the deputy continued to ask questions to try to understand what caused Knope to pace near Dorn's residence, and Knope told the deputy to go ahead and ask his questions. Knope said that he wanted to have more time with his kids. *Id.* at 14:08–11. Casasola asked Knope if he was thinking about going to talk to Dorn, and he responded that that it was "eventual." Knope continued to display signs of agitation and distress, such as exhaling forcefully, lowering and grabbing his forehead, asking for water, taking long pauses before answering, and mumbling. *See id.* at 13:15–19, 14:38–16:23.

A similar line of questioning continued for about 30 minutes. *See id.* at 16:15–48:38. The officers generally asked Knope how he got to the area, why he was there, whether he had made any efforts to speak with Dorn, and whether he was okay. More specifically, when the deputy asked Knope if he communicated with Dorn by calling her, he answered that they

texted each other. *Id.* at 18:54–59. Casasola asked Knope if Casasola could talk to Dorn, and he said no. *Id.* at 21:55–22:01. The deputy asked Knope what brought him to the area that he could not communicate by text message, and Knope did not answer that question. *Id.* at 24:20–26:27, 27:49–29:19. Nor did Knope answer when the deputy asked him if he felt okay. *Id.* at 19:42–20:23.

During the conversation, Knope's agitated and distressed behavior, which included grunting, continued. *Id.* at 18:39–19:34, 23:11–23:25, 24:36–24:47, 28:17–29:10, 29:38–30:32. Knope also gave odd answers to some of the officers' questions. For instance, when the deputy asked Knope if he had a headache and wanted water, he said "processing." *Id.* at 30:49–31:04. When the deputy asked Knope why he was there, he said "life, liberty, and the pursuit of happiness." *Id.* at 40:54–41:18.

Other officers arrived, and Casasola told Knope that he was going to speak with Dorn. *Id.* at 48:38–48:40. Knope said that he was going to speak to Dorn too, and Casasola responded, "No, you're not. You're going to stay right there." *Id.* at 48:46–48. At that point, two other officers moved closer to Knope. *Id.* at 48:48–50.

Dorn was hiding behind the door when Casasola entered the residence. *Id.* at 49:20–25. Dorn told Casasola that she noticed Knope on the sidewalk when she returned from work and saw him pacing while staring at her house for about 30 minutes before calling the police. *See* Dkt. 61 ¶ 24. Dorn also said that Knope harassed her all the time, had a history of violence toward her, had been arrested for domestic incidents with her, had been the subject of a "long" restraining order, and seemed "unwell." *See id.* ¶ 25; Dkt. 49-1, Ex. A at 49:41–50:34, 51:24–49.

Dorn told Casasola that she communicated with Knope by text message only and refused to talk to him on the phone because he is hostile, aggressive, and harassing. Dkt. 49-1,

Ex. A at 52:39–43. Dorn reported that, the prior weekend, Knope had texted her two times, saying that he wanted to go on a walk with their son and needed to give him a picture. *Id.* at 52:44–58. Dorn added that she told Knope no and that she didn't want him at her house. *Id.* at 52:59–53:02.

Casasola asked Dorn if Knope was allowed to see his son. *See id.* at 54:07. Dorn explained that she has sole custody and primary placement of their son and that Knope is not allowed to see him without supervision. *See* Dkt. 61 ¶ 28. Dorn added that that she had allowed Knope to see their son if Knope's father or brothers were with him, but that he was not allowed to see him on his own. *See id.*; Dkt. 49-1, Ex. A at 54:07–54:15. Dorn later said that a child custody order prohibited Knope from seeing his son without supervision. Dkt. 49-1, Ex. A at 58:29–59:00; *see also* docket sheet in Dane County case no. 2016FA1013 (entry dated October 25, 2023).

Casasola asked Dorn if Knope had previously shown up at her residence without notice and walked around outside. Dkt. 49-1, Ex. A at 55:00–04. Dorn said that Knope once stood outside and demanded that she send their son out, but that she refused. *Id.* at 55:17–55:24. Dorn also said that the last time he showed up without notice and "maintained visual" on her house was "probably between the end of July and [that day]." *Id.* at 55:48–56:08.

While gathering Dorn's information, Casasola remarked that he recalled a prior incident in which Knope had shown up at Dorn's residence without notice. *Id.* at 58:06–14. Dorn responded that, in June 2023, Knope went to her house and said that he was going to take their son even though he lacked legal permission to do so. *See id.* at 58:15–59:00.

Regarding how Knope's conduct made her feel, Dorn told Casasola that: (1) his behavior was "really unsettling" and made her "really nervous"; (2) she felt "very

uncomfortable" with him out there; (3) he caused her "so much" anxiety; and (4) she felt disturbed and intimidated by his "staring" and "posturing" as a "big guy." *See id.* at 53:05–53:15, 57:20–24, 58:29–59:00, 59:11–31.

After speaking with Dorn, Casasola sought to verify the information that she provided. Knope failed to provide his middle initial and date of birth. Initially, Casasola told the Dane County deputy that Knope had committed the offenses of stalking and obstruction. Dkt. 49-1, Ex. B at 5:48–6:10. Knope continued to refuse to provide his date of birth, and Casasola arrested him for obstruction based on the failure to identify himself. *Id.* at 6:25–7:38. Casasola located Knope's Wisconsin driver's license during the ensuing pat-down search.

While transporting Knope to jail, Casasola called someone. *Id.* at 16:06. Casasola stated that he was going to book Knope for obstruction and probably "send stalking up later" because he refused to identify himself despite the stalking investigation. *Id.* at 16:37–17:02. Knope was later charged with disorderly conduct with a domestic abuse modifier, but the case was ultimately dismissed without prejudice. *See* docket sheet in Dane County case no. 2024CM2492.

During a post-arrest interview with Dorn, Casasola stated, "I arrested him on . . . a misdemeanor [be]cause . . . at the time I don't believe I had enough evidence for stalking[;] like I said he's on a public sidewalk."

I will discuss additional facts as they become relevant to the analysis.

## ANALYSIS

Knope is proceeding on a Fourth Amendment claim for damages based on theories of illegal seizure and false arrest. *See* Dkt. 16 at 2–3. The illegal seizure theory is that Casasola

lacked a reasonable suspicion that Knope was involved in criminal activity when he initially stopped him. *See id.* at 3. The false arrest theory is that Casasola lacked probable cause to arrest Knope because he arrested him for obstruction even though Knope was unlawfully seized and merely refused to provide identification. *See id.*

## A. Illegal seizure theory

The Fourth Amendment guarantees the "right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. The first issue is whether Knope was seized under the Fourth Amendment and, if so, when that seizure occurred.

A person is seized under the Fourth Amendment if "a reasonable person would have believed that he was not free to leave." *United States v. Adebayo*, 985 F.2d 1333, 1338 (7th Cir. 1993). Courts must consider all the circumstances, including: (1) whether the encounter occurred in a public or private place; (2) whether the police made statements suggesting that the citizen was a crime suspect; (3) whether several officers were present; (4) whether the officers used forceful language or tone of voice; and (5) whether the citizen's freedom of movement was intruded upon in some way. *See United States v. Smith*, 794 F.3d 681, 684 (7th Cir. 2015).

The undisputed facts refute the allegation that Casasola seized Knope when the encounter started. Knope voluntarily answered Casasola's questions, who did not tell him that he had to stay where he was. Knope even said, "We can talk." Dkt. 49-1, Ex. A at 6:20–22. Similarly, Knope later told the Dane County deputy that he could ask him questions. The encounter occurred near a public sidewalk, and neither Casasola nor the deputy made statements suggesting that Knope was a crime suspect. Only two officers were present during most of the questioning, and they mostly asked Knope basic questions (e.g., how he got to the

area, why he was there, whether he was okay, and whether he had made any efforts to speak with Dorn). The officers' objective was to fully understand why Knope was pacing near Dorn's residence and why she called the police for help. The officers did not touch Knope or otherwise restrict his movement for the first 48 minutes of the encounter. Nor did the officers, during that period, use forceful language or tone of voice. The initial encounter lasted for an extended period, but that fact alone doesn't support a reasonable jury finding that Knope was seized, especially in view of his express willingness to speak with the officers. *See United States v. Moore*, 375 F.3d 580, 584 (7th Cir. 2004) ("[I]t is well settled that a consensual encounter between an individual and a law enforcement official does not trigger Fourth Amendment scrutiny, so that an inquiry into the duration . . . of the officers' questioning is unnecessary."); *cf. United States v. Weiss*, 153 F.4th 574, 581–82 (7th Cir. 2025) (concluding that a reasonable person in the defendant's position would have felt free to leave even though the police questioned him for one hour and 40 minutes). Knope appears to concede in his brief in opposition that, during the initial 48-minute period, he was not seized. *See* Dkt. 53 at 3.

After that initial period, the circumstances changed. Other officers arrived on the scene, and Casasola told Knope that he was going to speak with Dorn. When Knope said that he was going to speak with Dorn too, Casasola replied, "No, you're not. You're going to stay right there." At that moment, two other officers moved closer to Knope. A reasonable juror could find that, in those circumstances, a reasonable person would have believed that he was not free to leave.

The second issue is whether Casasola's seizure was justified under the Fourth Amendment. To be justified, the seizure must be supported by a reasonable suspicion. *United States v. Tyler*, 512 F.3d 405, 411 (7th Cir. 2008). "Reasonable suspicion is some objective

manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000). When making this determination, courts consider all the facts available to the officer at the time of the stop, including the officer's experience. *See Terry v. Ohio*, 392 U.S. 1, 21–23 (1968). The officer's subjective motivations for stopping and detaining a suspect are not relevant to the reasonableness inquiry. *United States v. Bullock*, 632 F.3d 1004, 1012 (7th Cir. 2011).

So I must consider whether, when Knope was seized, the facts available to Casasola supported a reasonable suspicion that he was engaged in, or about to engage in, criminal activity. *Terry* does not, however, require Casasola to show that he had a reasonable suspicion that Knope was committing, or was about to commit, a specific crime. *See United States v. Pack*, 622 F.3d 383, 383 (5th Cir. 2010); *United States v. Guardado*, 699 F.3d 1220, 1224 (10th Cir. 2012); *Carroll v. Lynch*, No. 07-cv-1575, 2011 WL 1838563, at *21 (N.D. Ill. May 13, 2011), *aff'd*, 698 F.3d 561 (7th Cir. 2012); *Tom v. Voida*, No. 89-cv-857, 1991 WL 343377, at *4 (S.D. Ind. May 3, 1991), *aff'd*, 963 F.2d 952 (7th Cir. 1992).

When Knope was seized, the facts available to Casasola supported a reasonable suspicion that he was about to engage in criminal activity, and no reasonable jury could find otherwise. Dispatch had notified Casasola that Dorn had reported that Knope was pacing outside the residence for approximately 30 minutes, had schizoaffective disorder, and could be unwell. Casasola's interactions with Knope corroborated Dorn's report. *See United States v. Booker*, 579 F.3d 835, 838–39 (7th Cir. 2009) (information from a single, identified witness can support a reasonable suspicion if it is significant in detail and substantially corroborated prior to the stop). Knope was walking on a sidewalk near Dorn's house when Casasola approached him. Knope, showed signs of agitation, distress, and instability. Knope said that

he wanted more time with his kids, believed in marriage and not in divorce, and would "eventual[ly]" talk to Dorn. Knope also told Casasola that he was not allowed to speak with Dorn. These facts suggest at least that Knope was upset with Dorn and wanted to harass, control, or intimidate her. Later, when Casasola said that he was going to speak with Dorn, Knope said that he was going to speak with her too, prompting the officers to stop him. Knope, a stockily built man, had also told Casasola that his own "physical capabilities" were a weapon. Knope's unstable behavior and threatening statements supported at least a reasonable suspicion that he was about to engage in some criminal activity, such as trespass or assault. Because the seizure was indisputably supported by probable cause, I will grant summary judgment to Casasola on Knope's Fourth Amendment illegal seizure claim.

## B.  False arrest theory

Knope alleges that Casasola lacked probable cause to arrest him because the arrest was for obstruction even though Knope was unlawfully seized and merely refused to provide identification. As explained above, Knope had been lawfully seized before Casasola arrested him. The issue is whether the arrest was unlawful because Casasola said that it was for obstruction based on Knope's failure to fully identify himself.

Probable cause to arrest is an absolute defense to any claim against police officers for false arrest. *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006). Probable cause means that the circumstances that Casasola was aware of were enough for a prudent person to believe that Knope had committed an offense. *See United States v. Hill*, 818 F.3d 289, 294 (7th Cir. 2016). "Determining whether an officer had probable cause to arrest entails a purely objective inquiry; the officer's subjective state of mind and beliefs are irrelevant." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013). Knope's arrest comported with the Fourth

Amendment if the information known to Casasola at the time would have provided a reasonable officer with probable cause to arrest him for *any* offense, even one unrelated to the one for which the arrest was actually made. *See Fox v. Hayes*, 600 F.3d 819, 837 (7th Cir. 2010). I will not consider whether Casasola had probable cause to arrest Knope for obstruction because the undisputed facts, as explained below, show that he had probable cause to arrest him for the separate offense of stalking.

The existence of probable cause depends, in the first instance, on the elements of the predicate criminal offense as defined by state law. *Hawkins v. Mitchell*, 756 F.3d 983, 994 (7th Cir. 2014). Probable cause does not, however, "require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Id.* at 994–95.

The Wisconsin stalking statue prohibits "intentionally engaging in a course of conduct directed at a specific person that would cause a reasonable person under the same circumstances to suffer serious emotional distress or to fear bodily injury to or the death of himself or herself or a member of his or her family or household." *Maier v. Smith*, 912 F.3d 1064, 1069 (7th Cir. 2019) (alteration adopted) (citing Wis. Stat. § 940.32(2)(a)). "The state must prove the defendant knew or should have known that one of his or her acts would likely cause the victim serious emotional distress. *Id.* (citing § 940.32(2)(b)). "The acts must have also actually caused the victim serious emotional distress." *Id.* (emphasis omitted) (citing § 940.32(2)(c)); *see also* Wis JI-Criminal 1284.

A "course of conduct" means "a series of 2 or more acts carried out over time, however short or long, that show a continuity of purpose." § 940.32(1)(a). Such conduct includes, among other conduct, "[m]aintaining a visual . . . proximity to the victim" and "[a]ppearing at the victim's home." *Id.* § 940.32(1)(a)1–2.

11

Casasola had probable cause to arrest Knope for stalking, and based on the undisputed facts, no reasonable juror could find otherwise. Casasola's interactions with Knope supported Dorn's report that he was pacing outside her house and appeared unwell. During the encounter, Knope acted in a distressed and odd manner, and he made statements and displayed behaviors showing that he was upset with Dorn because of marital and custody matters and was determined to speak with her.

Casasola gathered more facts from Dorn, who was hiding behind the door when he entered the house. Dorn said that Knope harassed her all the time, had a history of violence toward her, had been arrested for domestic incidents with her, and had been the subject of a long restraining order. Casasola asked Dorn specifically if Knope had ever shown up at her residence without notice before and walked around outside. She said that Knope once had stood outside and demanded that she send their son out, and that he had last shown up without notice and "maintained visual" on her house approximately six weeks earlier. Casasola recalled having responded to a previous incident in which Knope had gone to Dorn's house and asked to take their son, and the docket sheet in the '1013 case supports Dorn's statement that Knope lacked legal permission to take him. Knope hasn't submitted any admissible evidence showing otherwise. Dorn repeatedly told Casasola that Knope's conduct, which included "staring" and "posturing" by a "big guy," caused her emotional distress, and she was visibly nervous throughout the conversation. The video supports Casasola's statements that Dorn's "voice was trembling," that she appeared "visibly uncomfortable and scared, and that she avoided being seen by . . . Knope." Dkt. 50 ¶¶ 27–28. Based on the undisputed facts, any reasonable juror would find that a prudent person would believe that: (1) Knope was intentionally engaging in a course of conduct directed at Dorn that would cause a reasonable person in the circumstances

to suffer serious emotional distress; (2) Knope should have known that his presence would likely cause Dorn emotional distress; and (3) Dorn experienced emotional distress.

Knope contends that Casasola lacked probable cause to arrest him for stalking, primarily because Casasola later told Dorn that he did not believe that he had enough evidence for stalking. Dkt. 53 at 4. Casasola's statement is immaterial because the probable cause standard is objective; Casasola's subjective belief does not determine whether probable cause existed to arrest Knope for stalking. Knope's other contentions misstate the evidence and the elements of stalking. *See id.* I will grant summary judgment to Casasola on Knope's Fourth Amendment claim based on the false arrest theory.

Knope asks me to allow oral argument. Dkt. 65. The basic rule is that a "summary judgment motion may be properly ruled on without oral argument." *Henkin v. Gen. Elec. Credit Corp.*, 925 F.2d 231, 233 (7th Cir. 1991); *see also Deutsch v. Burlington N. R. Co.*, 983 F.2d 741, 745 (7th Cir. 1992) (stating that Federal Rule of Civil Procedure 56 "does not require a hearing"). Couching the request for oral argument in due process terms, as Knope does here, does not show otherwise. *See Menier v. Thompson*, Nos. 94–3102, 94–3104, 85 F.3d 631, 1996 WL 158328, at *3 (7th Cir. Apr. 2, 1996). The undisputed facts conclusively show that Knope's Fourth Amendment claim lacks merit. Dkt. 65. Oral argument would not change that result. Knope has not shown any procedural unfairness to support a potential due process claim. I will deny the motion for oral argument.

ORDER

IT IS ORDERED that:

1. Defendant Officer Kyle Casasola's motion for summary judgment, Dkt. 47, is GRANTED.

2.  Plaintiff Kevin Michael Knope's motion for oral argument, Dkt. 65, is DENIED.

3.  The clerk of court is directed to enter judgment and close the case.

Entered June 3, 2026.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge
